Good morning, your honor. Thomas Otake on behalf of Malia Arciero. Thank you for your time this morning. You know, oftentimes when we see these ineffective assistance of counsel claims, it can be he said, you know, he said, she said. In other words, the defendant says one thing, the attorney says, I didn't say that. Well, here we have these offensive emails from the now disbarred Mr. Gary Dubin that document the deficient and ineffective advice he provided to her. But we know what his advice to her was. When you take that advice, and you apply it to the test set forth in cases like Strickland and Lafler, it can easily be said that it was not objectively reasonable for him to encourage her to go to trial in the face of overwhelming evidence against her was not a good but but but but counsel is as the district court found. Um, she discharged her first attorney, because he advised her to take a plea, and she didn't want to do it. She hired Mr. Dubin, because he would take the case to trial. And then shortly before the trial, the government proffered what I consider to be a bizarre plea offer a bizarre conditions in the plea offer, which I'll ask your friend about. But nonetheless, she basically said, I'm not gonna do this. I want to go to trial. Let's let's go to trial. I mean, she got a plea offer, she turned it down. And she went to trial. So how, how is she prejudiced when it seems clear as Judge Moway found that she went to trial because she wanted to go to trial. So you know, I'll just reiterate some of the things we pointed out in our reply brief. And that is just because a defendant initially has the position of maybe wanting to go to trial that does not at all alleviate counsel's duty to adequately inform them and advise them of the risk of doing so and, and add an advocate for a more reasonable position. Here we have, but she but she knew the risk counsel. I mean, I can't put my finger right now on the exact email. But I mean, there's one email where she talks about how things go wrong, she's going to get 20 years, right. But but I think you need to couple that, Your Honor, with the emails that Mr. Dubin sent in which told her, you know, there are emails where she's expressing a desire to plead out. And then he tells her in those emails, if you plead out, you'll get the 20 year maximum. He tells her I can win this trial. And he encourages her to go to trial stop, I think he called it her emotional tantrum and we go to trial to win. And so I understand that she did express initially a desire to go to trial. She then later expressed a and it's that it's the advice at that point when Mr. Dubin tells her something we don't know is false, which is if you plead out now, you'll get the maximum 20 years. You can't falter for after that then saying, well, okay, yes, let's go to trial to win. Clearly, there are emails where she expressed a hesitancy. And I think that's where we go back to just because the client may think about trial, the counsel counselor still needs to advise them and point them in the right direction. You cannot say it's objectively reasonable in the face of a confession in the face of recordings in the face of text messages in the face of a pound of drugs found in your car for an attorney to tell someone, let's go to trial, I can win this trial. I mean, that's that's we used to have a chief judge that would often say, I think you're going up the hill without a payload. And I sat and tried to figure out what that meant for several cases. But I assume what he meant was this argument is not leading you anywhere. And that's one of those questions I want to ask. Judge, the district judge here was very careful on what she was finding and what she was holding. And it's clear to me and reading what she said, that she is not adding anything to the penalty. Because of what the lawyer did. She's basing it completely on what your client said. What she did. Now, if that's true, and I've read it two or three times, I think that's what she said. And it appears to be that's what she means. Why are we into this case at all? Because there's no harm, no foul. Well, thank you, Your Honor. There is extreme harm. If you read what she said, what she said is it's the pre-trial motions litigation and what was proffered during the pre-trial motions that led to the increased sentence. She made it clear that this was a typical drug case. You know, the client was safety valve eligible. When she made the sentence, she made it clear that she was doing it because of what she said in her declaration, not that the lawyer brought it to her attention. So if that happened, then why are we here? Well, it's the lawyer's decision what pre-trial motions to file. And this is something we addressed in our reply. I mean, I know the U.S. attorneys say, well, you know, she told this lie. And then we have cases like Johnson v. Baldwin and Phillip v. Woodford, which says, you know, that doesn't, again, alleviate the counsel's duty to advise correctly. What motions are filed is up to the client. And what the judge in the district court, I'm sorry, in the district court said was really it was what happened in that pre-trial motions practice where the declaration was submitted in really, you know, frivolous motions that had no chance of success. That's what led to the enhanced sentence. I mean, of course, it was my client, Ms. Arcero's words, but it was the counsel who decided to use it. And it was objectively unreasonable to use her word in that story in a declaration in these motions that had zero chance of success. And keep in mind, I mean, I think we all know how the guidelines work. And we cannot ignore that had she pled out, she would have got three levels off for acceptance of responsibility. That could have been a huge difference. And these are things that did make a difference. And so I think it's very, you know, I think the Loeffler case is very instructive. I mean, it. Counsel, I have an unrelated question for you. You say in your brief at page 47 that you're not asking for the normal remedy because of the overwhelming evidence against your client. And you say what you want is vacate the sentence and remand for resentencing on a record purged of the Faulkner allegations and the other effects. So in essence, you're asking us to grant the writ, vacate the sentence and send it back for a judge to consider it on basically an alternative universe of facts that aren't really the facts that were present here. And you don't cite any authority or this kind of a remedy. Are you aware of any court that has ever anything like this? Because I don't see any site to any case like that in either of your briefs. I think when you look at the Loeffler case and the state versus Morrison case, it says that where a defendant shows ineffective assistance has caused the rejection of a plea leading to a more severe sentence at trial, the remedy must neutralize the taint of the constitutional violation. And I think the case is there's a long discussion of that, I think, in the Loeffler case. I mean, we're not, we don't think it would be appropriate to say, set aside a conviction and let's retry this case. But we think that you should go back and remand for resentencing and neutralize the taint. I'll say this, I understand, this is important, I think, you know, I understand the difficulty in the allegations against agent Faulkner and going back and pretending that didn't happen. And, you know, really the effect of that on the sentencing was a two level increase for obstruction of justice. And, but the three level decrease that she would have got for acceptance of responsibility, had she not been told she could win the case, had she not been told she would get the 20 years if she pled out, that can easily be remanded and guidelines can be recalculated and she can be given a chance to accept responsibility. And that's, I think, consistent with what Loeffler says should happen in these types of cases. So I would argue that there is precedence that would support a remand and resentencing and with removing the taint that can be removed and should be removed. So I have one unrelated and maybe ungermane question. Did the government ever provide, either you or to your knowledge, Mr. Dubin, any results of any investigation into your clients' rape allegations against agent Faulkner? Was there anything that indicated that they in any way investigated that particular claim as opposed to their investigation of the other claim that's described in Mr. AUSA Kawahara's email? You know, I'm not aware, your honor, of anything that was provided along those lines. Maybe Ms. Purcell might be more familiar with that, but not to my knowledge. And, you know, I just, again, you know, when you read the emails, it just, you cannot say it was objectively reasonable to encourage her to go to trial in this case, to tell her that she could win, to tell her that she would get the 20-year maximum if she pled out. That was just wrong. And that obviously had an effect on her going to trial. Thank you. All right. Thank you. Counsel for the United States, whenever you're ready. Thank you, your honors. Marian Purcell, Assistant U.S. Attorney for the United States. I think where I'd like to start is with the time frame. Mr. Dubin appeared for the MRCRO in November of 2013. In November of 2013, as I believe it was Judge Bennett pointed out, she came to him precisely because she was dead set on fighting the charges and going to trial. She fired Mike Green for that reason. That was where she was going, and she was dead insistent on it. And there's, there are emails that support that, that time frame from November of 2013. He did not enter the first, the first reference to the allegations against Agent Faulkner appear about four months later in the testimony of the bail revocation hearing. So he doesn't immediately on a dime, without any time to think it through, raise those allegations to the court. There's more to be said about that initial, that initial event, but fast forward all the way until where two weeks from the date the trial actually starts. This isn't a hypothetical trial date. It's a real trial date in early December of 2014. It finally gets cold feet. And it's just literally a couple of weeks before the trial. If you look back at where we were in the end of 2013 and the beginning of 2014, the pair of them, Ms. Arciero and her attorney together, made a decision about what direction they were going in. And it was driven by Malia Arciero's determination to fight these charges for absolute insistence that she was innocent and that she had been abused. She'd been set up. The drugs had been planted in the car. Her sister was the real drug trafficker. Agent Faulkner had an informant who literally put the drugs in her car. She was innocent. She was not going to plead half. He could strong harm her and beat her up until she finally agreed to plead, which may very well have been in her interest. Or he could say, all right, I get it. You're innocent. You tell me you're innocent. I believe you when you tell me you're innocent. The evidence is... Counsel, is Mr. Otake correct that Mr. Dubin in this time frame emailed her and said, if you take this plea, you're going to get 20 years? He is correct. It depends what you mean by this time frame. That happens just before trial. Within a couple, three weeks before trial, he does suggest that. It's clear that he's saying both with respect to a guilty plea and going to trial at that point. If you plead guilty, you're in big trouble. Judge isn't going to like you. If you go to trial, at least you have a chance of acquittal. We're going to try to make that happen because you've told me that you're innocent. If you're innocent, it doesn't make sense to plead guilty and go to jail for years. Counsel, I want to ask you about this plea agreement, which had in it as a condition of acceptance that she retract her allegation that Agent Faulkner had raped her and forced her to provide oral sex. I myself have never seen a condition like that for accepting a plea agreement with a declaration to that effect written out by the government. What was the basis for that requirement? I understand the part about Agent Faulkner taking the $200,000 and Mr. Kawahara's email laid out the investigation the government had done. What was the basis of conditioning her accepting the plea on retracting the rape and sexual assault allegation? Your Honor, I don't have any inside knowledge and that's not in the record. In other words, if there was precisely what the factual basis was, I do not know. I believe it is reasonable to conclude from the record as a whole that an investigation was, in fact, we know that an internal affairs investigation was begun. It's reasonable to conclude by the time that was done, which is many months after the allegations first surfaced, that there had been an investigation. Agent Faulkner, in fact, did not do those things. We all know that now. And it's a reasonable guess that by November of 2014, the government had strong reason to believe that Agent Faulkner had done none of those things. Although that isn't in the email accompanying the plea offer, although there's a detailed discussion of the investigation into the allegations, there's no mention of any investigation into these allegations. That's right, Your Honor. I just don't have anything to add on that except that I strongly believe that by that time, representatives of the government knew that Agent Faulkner had not done those things based on the investigation. Of course, again, today we all know that he didn't do those things. That's all I can add with respect to the factual basis for that request. Although on this, we all know, as the trial court pointed out in her order denying the petition, even in the petition, Ms. Arciero submitted a declaration which at least one reading of it was that the allegations were true. She never gave up on those allegations with the single exception of the retraction that Ms. Jotaki submitted a couple of days before the sentencing. It's right in the pre-sentence investigation report. She told probation that it happened. And even as late as the filing of the 2255, she still made at least an oblique reference to having been abused. Yes, I read the pre-sentence report. Her saying those things to clearly against all of her interests, but she said them anyway. She never gave up on those false allegations. The one main point that I want to make sure that I make here is that if she was not going to plead, and it was absolutely clear to Mr. Dubin through most of their representation until very late in the game, that she was not going to enter a guilty plea. If she's not going to enter a guilty plea, he has to defend her by fighting the charges the best way that he can. How is he going to do that? He's going to try to get her statements pressed. He says, I never said those things to Agent Faulkner. He coerced me into signing that document. He made me do it, even though, in fact, he made me put handwritten changes on it to make it look like it was really mine. It wasn't mine. She tells him this. And as a matter of fact, he believes her story. And I think that's a key element. He actually believes. And it's easy in retrospect to think that's silly, but that's not what was going on then. And Strickland makes it clear that he actually believed that she had not made those statements. So he reasonably moves to suppress those statements. He actually believes that she's been abused during her period of cooperation. So he moves to dismiss the charges based on outrageous government conduct. It's in hindsight we know that that's ridiculous. But at the time, that was the only reasonable choice he had. He was unable to convince her to enter a guilty plea. And if she was not going to enter a guilty plea, he didn't seriously consider rolling over and playing dead. That didn't seem like the right way to defend her. Counsel, is it correct that Mr. Dubin offered and the judge gave an entrapment instruction? It is, Your Honor. So apparently, the judge thought this the evidence was sufficient to instruct the jury on a defense, which if they'd believed would have resulted in an acquittal. That's correct, Your Honor. She stated that in her written order that she believed there was sufficient evidence to justify the instruction. So I'm not, obviously, I can't defend every single thing Mr. Dubin ever did. I certainly would not have written the emails in the tone that he did late in the game. But by the time you get to that point, weeks before trial, he's not being unreasonable. I think his tone is unreasonable. But his decision to encourage her to stay the course, at that point, does make sense. Because she's committed by her own decision to fighting and to sticking to this series of what turned out to be false allegations. And at that point, he knows that if she's guilty, the judge, in fact, will be very unsympathetic. And if she goes to trial, at least there's a chance that she might succeed in pulling it off. I see that my time is up. If anyone has any further questions. Thank you, counsel. Mr. Otake, we'll give you two minutes for rebuttal. Thank you. You know, Ms. Purcell ignores the fact that whether it's a week or two or right before trial, you still have the ability to get two levels off for accepting responsibility. And we all know that the court would look upon sentencing more favorably if you cut out before trial or not. You know, Ms. Purcell also says that, as Malia just said, I want trial no matter what. On page 17 of our brief, she's sending the email to Mr. Dubin. Is there any way that we can change our plea? Instead of her sister changing hers on Friday, wouldn't that be better? I really don't want to take a gamble in going to trial. There's so much evidence against me it seems impossible. And what does Mr. Dubin say back to her? When you retained me, we had a surefire game plan. Nothing has changed except your emotional traumas. I mean, your emotional tantrums. Ask yourself, why would they give you anything but the maximum sentence now? And then he says there's a new player in town, me. We go to trial to win. You know, I mean, it'd be one thing if someone insisted on trial, the attorney advised them for a reason. We're supposed to counsel attorneys even when they may be their own worst enemy. We're supposed to advise them of the pros and cons, not encourage them to do something incredibly, frankly stupid. She confessed there was a pound of drugs in the car. There was no way they were going to win this trial. It's absurd to suggest that, well, the best thing to do two weeks before trial is still do the trial. That's not objectively reasonable. Mr. Dubin, his emails are atrocious. The things he said about the court, the things he said about the U.S. attorneys, and it flows likely from the fact that he was prosecuted for tax fraud in the past. And he has since been disbarred by the Hawaii Supreme Court. We have to do better than in our profession. And we cannot let this happen. And all we're asking is that at the very least, she get the remand for the two-level reduction to remove the taint, him telling her she would get 20 years if she pled, which was not true, and encouraging her to go to trial, which was not objectively reasonable. That's all we're asking. Thank you. All right. We thank counsel for their helpful arguments. And the case just argued will be submitted.
judges: Wallace, Bea, Bennett